UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


| | | |
|---|---|---|
| POLY-AMERICA, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:08-CV-2224-G |
| STEGO INDUSTRIES, L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |


## MEMORANDUM OPINION AND ORDER


On December 17, 2008, Poly-America, L.P. ("Poly-America") filed this suit against Stego Industries, LLC ("Stego") seeking a judgment declaring that (1) Stego's trademark is not registrable under the Lanham Act, 15 U.S.C. §§ 1051, *et seq.* (the "Act"), (2) Stego has no common law right to its trademark, and (3) Stego engaged in unfair competition by defrauding the United States Patent and Trademark Office ("PTO"). *See generally* Complaint (docket entry 1). After reviewing the evidence presented during a two-day bench trial, and for the reasons set forth below, the court finds that Stego's mark is functional and not legally protectable, but Poly-America has not proven its fraudulent procurement claim by clear and convincing evidence.

# I.  BACKGROUND

## A.  Procedural Background

The court held a bench trial in this case from May 16 to May 17, 2011, in which it received evidence and heard testimony from Terry Mallory ("Mallory"), the Senior Sales Manager for Poly-America; Paul Blasdel, a co-founder of Stego; Carroll Bryan ("Bryan"), a former trademark lawyer and co-founder of Stego; Matthew Blasdel, a current employee of Stego and the son of Paul Blasdel; and Marshall Grove ("Grove"), the Vice President of Manufacturing and Operations for Shields Bag and Printing Company -- a company that manufactures vapor barrier for Stego and identifies Stego as its largest single customer.  As a result of that trial, the court finds the following facts and reaches the following conclusions of law.

## B.  Findings of Fact

### 1.  *History and Use of Vapor Barrier*

In many construction projects, before a concrete slab is poured, it is imperative to address vapor retardation under the concrete foundation.  Joint Pretrial Order ("Pretrial Order") at 18 ¶ 30 (docket entry 104).  If allowed to permeate the concrete slab and penetrate a building's footprint, vapor might cause adhesives used for carpet or flooring to erode or toxic mold or other toxic conditions to develop.  *Id.* at 18 ¶ 32. Not surprisingly, the toxic-mold litigation of the 1990s increased awareness of, and the desire to prevent, the migration of moisture and gas from the earth to the

concrete slab.  Tr. 319:21-320:19.  By 1998, builders and contractors generally employed a thin layer of black low-grade plastic sheeting as a barrier to prevent such migration.  Pretrial Order at 19 ¶ 36.  In those days, plastic sheeting was often laid down in a haphazard fashion and without concern for the integrity of the sheeting itself.  Tr. 315:14-317:19.

At some point, however, the construction industry began developing standards for vapor barrier,[1] culminating in the American Society for Testing and Materials ("ASTM")'s promulgation of ASTM 1745, specifying industry standards for tensile strength, puncture resistance, and impermeability of vapor barrier, and ASTM 1643, setting forth industry standards for vapor barrier installation.  Tr. 362:2-363:13; *see also* Defendant's Exhibits ("DX") 9, 10.  ASTM standards specifically instruct that all damaged areas be repaired, DX 20, 23, and all tears, punctures, and even pinholes be identified and rectified, Tr. 214:15-20, to prevent vapor from seeping through the damaged area and penetrating the building's footprint.  Pretrial Order at 18 ¶¶ 31-32.  Laborers must visually inspect for damaged areas by walking the site -- spanning as much as 1.6 million square feet -- to try and spot tears, punctures, and pinholes in the vapor barrier.  Tr. 216:8-217:2.

---

[1]     The terms "vapor barrier" and "vapor retarder" are used interchangeably in the industry.  Tr. 28:6-12.  The court uses the term "vapor barrier" here to mean under-slab plastic sheeting used to either retard or eliminate vapor migration.

The ASTM standards, however, are neither comprehensive nor exhaustive.[2]
Instead, they are products of unanimity within the ASTM committees responsible for
their development. Tr. 361:4-20, 437:4-10. Nothing can be added or removed from
ASTM 1745 or ASTM 1643 unless every member of the respective committee agrees
to the proposed alteration. Tr. 437:4-10. The committees are all-volunteer
organizations comprised of "anyone really who has an interest in a particular
construction field . . . [who] becom[es] a voting member" and intended to help
provide the best products possible to the building and construction industry. Tr.
361:4-20.

Generally speaking, before vapor barrier is laid down, the underlying soil is
compacted and flattened by heavy machinery. Tr. 349:15-22. Occasionally, a two-
inch layer of sand might be leveled out on top of the soil.[3] Tr. 350:5-17. Once the

---

[2]    For example, there is no dispute that translucency helps workers
properly overlap the seams of vapor barrier and confirm that such has been done.
Tr. 386:25-387:2. The ASTM standards, however, do not address translucency, Tr.
387:3-9, nor do they address safety issues, use of vapor barrier on inordinately hot
job sites, inspection and detection of damaged areas, or -- most importantly for this
case -- the use of color. DX 23; Tr. 98:19-101:6, 129:14-130:14.

[3]    The undisputed evidence shows that black vapor barrier is strongly
disfavored because it does not sufficiently contrast with the underlying soil. Tr.
384:14-385:20. Nevertheless, Paul Blasdel testified that an installed vapor barrier
will typically have sand layers below it to provide a smooth flat surface for the vapor
barrier and guard against punctures or tears, Tr. 350:9-17, and the sand is normally
"tannish, yellowish, [or] light-colored." Tr. 351:14-15. The wide use of sand
underneath vapor barrier, however, does not square with the industry's concern about
black vapor barrier's low contrast with soil. Not a single photograph entered into

(continued...)

substrate is flat and compact, the vapor barrier is rolled out, Tr. 350:5-11, and overlapped six inches at the edges, with the overlapping areas taped at the seams. *See* Tr. 351:19-352:19. All pipe penetrations are then sealed, rebar is installed on top of the vapor barrier, and workers walk the site to visually inspect the vapor barrier for tears, punctures, and pinholes. *See* Tr. 351:19-352:19; *see also* DX 20, 23. After all necessary repairs are made, concrete is poured for the slab. *Id.*

## 2. *Stego's Yellow Vapor Barrier*

Stego, formed in 1998 by Paul Blasdel and Carroll Bryan to develop and distribute high performance vapor barrier for use in construction related applications, Pretrial Order at 19 ¶ 38, was the first company to market vapor barrier that purported to satisfy ASTM 1745. Tr. 318:7-319:3. Stego was also the first company to pick a bright, light color -- yellow -- for its vapor barrier. *See* Tr. 317:25-318:2. Stego first began using yellow as its trademark in November of 1998. Pretrial Order at 19 ¶ 42.

On April 6, 2002, Stego filed an application with the PTO for a trademark on the color yellow as applied to vapor barrier used in building construction. *Id*. at 14

---

[3](...continued)
evidence shows a job site where sand is used either underneath or on top of the vapor barrier. Moreover, the puncture resistance and tensile strength of modern vapor barrier obviates the need for the use of sand, which adds unnecessary costs to a project. Tr. 350:25-351:7. Thus, the court finds that the use of sand underneath vapor barrier is atypical, and does not accurately reflect general practice in the construction industry.

¶ 13.  On August 22, 2002, the PTO refused Stego's application, stating, among

other things:

REGISTRATION REFUSED -- SINGLE COLOR

> The trademark attorney must refuse registration on the
> Principal Register because the proposed mark appears to be
> functional. . . .  That is, the proposed mark consists of a
> color which serves a utilitarian purpose. . . .

* * *

> Please note that where a proposed mark identifies a color
> which is functional, it is not registrable on either the
> Principal or Supplemental Register.  A color mark may be
> functional if it serves a purpose, such as yellow or orange
> for safety signs.  In this case the proposed mark could be
> functional because the vapor barrier is more easily seen
> when installed and thereby allow contractors to ensure that
> the product is in place, a clear safety benefit.

*Id.* at 14-15 ¶¶ 14-15.

On February 20, 2003, Stego responded to the PTO's declination, advising the

PTO examiner that "the mark is neither functional nor serves a utilitarian purpose."

*Id.* at 15-17 ¶¶ 16, 17.  Stego submitted with its response more than one-hundred

pages of supplemental materials, including an advertisement that stated:

> Stego Wrap vapor barrier is yellow for a reason.  First, the
> natural extrusion of Stego Wrap polyolefin plastic &
> additives is a clear plastic much like visquene or poly.
> Bright yellow dye is added to distinguish Stego Wrap from
> poly laminates.  Second, most vapor retarders are black
> poly laminates.  Black poly absorbs tremendous heat
> creating very hot jobsite conditions for laborers.  Third,

> puncture or tears (although unlikely) can be seen and
> easily repaired in our bright yellow membrane.

*Id.* at 15-16 ¶ 19.  Stego included this entire advertisement, without any redactions,

in its response to the PTO.  Tr. 229:14-23.

On December 9, 2003, presumably after reviewing Stego's response and

supplemental material, the PTO issued Stego a trademark for the color yellow as

applied to "plastic sheeting used in the construction industry as a vapor barrier and as

a vapor retarder," Registration No. 2,790,352 ("the mark").  *See* Pretrial Order at 16

¶ 19 and 19-20 ¶ 43.  Thereafter, Stego -- under the direction of Bret Houck, the

company's National Marketing Manager -- began its "Think Yellow" promotional

campaign.  That campaign is typified by the following advertisement:

> Think Yellow!
>
> There are two key reasons why Stego Wrap is bright
> yellow:
>
> It's easier for contractors to see damaged areas and it draws
> less heat on-site, according to Stego's Bret Houck.
>
> Field tests have proven that it's difficult to find and repair
> rips in black or clear barriers, says Houck.  Although Stego
> Wrap rarely tears or punctures, if they can see the
> puncture, then they can repair it, which helps maintain the
> integrity of the overall system.
>
> He adds that while it may be sunny yellow, Stego Wrap
> also absorbs less heat than a midnight black or dark-
> colored barrier.  This eliminates any potential curing
> problems associated with pouring cold concrete on a hot
> barrier surface.

*Id.* at 15-16 ¶ 19.  Since its inception, Stego has sold hundreds of millions of square feet of yellow vapor barrier.  Tr. 346:2-8.

### 3. *Stego's Competitors*

Poly-America, formed in the 1970s, manufactures and sells a variety of plastic products.  Pretrial Order at 13 ¶¶ 1, 2.  In late 2006 or early 2007, responding to customer requests, Poly-America manufactured vapor barrier in yellow.  *Id.* at 16 ¶¶ 20, 21.  On January 3, 2007, Stego sent Poly-America a cease and desist letter, demanding that Poly-America "avoid any use of the color yellow" with its products that would likely lead to confusion with Stego's mark.  *Id.* at 17 ¶ 22.  As a result, Poly-America did not sell any of the yellow vapor barrier that it manufactured; instead, it began selling vapor barrier in orange.  *Id.* at 17 ¶¶ 24, 25.

Like Poly-America, Stego's other major competitors entered the market for high-performing vapor barrier at some point between 2000 and 2007.  Tr. 320:24-322:19, 313:17-24.  Some of Stego's competitors have elected to manufacture, market, and/ or sell vapor barrier in color (including, but not limited to, blue, gray, green, red, seafoam, black, and white), while others have chosen to use no color at all.  Tr. 369:20-372:8.  At least one of Stego's competitors uses color to distinguish the different lines of vapor barrier it sells so customers can easily determine the thickness of the product in use.  Tr. 324:3-325:7; Plaintiff's Exhibits ("PX") 21, 22, 26.

4. *Costs and Benefits of Yellow*

Vapor barrier is naturally colorless when manufactured. Tr. 47:4-10. The addition of yellow (or any other color) increases the cost of the naturally-colorless product. Tr. 47:23-25. The cost of color pigment is subject to market forces, so one color may be cheaper than another today but more expensive tomorrow. Tr. 468:15-21; Pretrial Order at 20 ¶ 47. The addition of color also dilutes the concentration of the ingredients that comprise the vapor barrier, thereby weakening the tensile strength, puncture resistance, and impermeability of the product as compared to its undiluted, colorless state. Tr. 47:19-23, 109:2-19, 365:11-366:8.

On the other hand, color offers utility when applied to vapor barrier. *See* Tr. 356:11-19, 357:16-21. For example, a bright, light color -- like yellow -- generally contrasts well with the underlying soil and overlaying rebar on a construction site, allowing workers to easily see (and subsequently repair) tears, punctures, and pinholes in the vapor barrier.[4] Tr. 54:1-12. Likewise, because light colors absorb less heat than dark colors, a yellow vapor barrier would attract less heat on a job site than would a darker-colored vapor barrier. Tr. 74:25-75:2, 82:15-83:4. Using vapor barrier that is yellow, as opposed to a darker color, can tangibly benefit workers by

---

[4] Soil colors range from light to dark, making no one color the best for contrast in all circumstances because some colors that contrast well with dark soils may not contrast well with light soils. Tr. 121:14-122:13. Nevertheless, color (in some cases light, in other cases dark) can be used to enhance a vapor barrier's visual contrast with the underlying soil. And yellow is one such color.

creating a cooler, and consequently safer, job site.  Tr. 189:13-19.  The absorption of

heat, moreover, can create problems for the vapor barrier itself by causing it to

"walk," or move around on the earth, Tr. 53:1-25, and produce gaps that allow vapor

to migrate through the concrete slab.  *See* PX 8.  Compared to a darker-colored vapor

barrier, a yellow vapor barrier is less likely to have such unwanted movement.  *See* Tr.

54:1-12.  Indeed, in its marketing and advertising materials, Stego has openly

promoted these utilitarian benefits -- high visual contrast and low heat absorption --

of its trademarked yellow.  PX 1, 6, 19, 29-31, 43.  In one "advertorial," published in

late 2006 or early 2007, Stego explains that the "two key reasons" why its vapor

barrier is yellow are: "It's easier for contractors to see damaged areas and it draws less

heat on-site. . . ."  PX 19.

The addition of color to vapor barrier, however, is not necessary to prevent the

migration of vapor, gas, or moisture from the earth to the concrete slab.  Tr.

73:16-19.  Any undamaged vapor barrier that is overlapped, taped at the seams, and

sealed at the pipe penetrations will properly prevent migration of vapor in accordance

with industry standards.  The addition of color simply makes it easier for workers to

spot defects that need to be corrected.  Tr. 221:3-10.  This is not to say that a bright,

light color is a prerequisite to the detection of a vapor barrier's damaged areas.  Such

areas may still be detected by workers visually inspecting the vapor barrier regardless

of whether the vapor barrier has a light or dark color, or it is in its naturally colorless

form, because tears may become uneven and frayed and punctures may stretch the vapor barrier and create protrusions that are easy to spot. Tr. 357:1-358:18. Even so, as the field tests cited by Stego in its marketing materials confirm, the addition of a bright, light color to a vapor barrier can make the process of identifying and repairing damaged areas much easier in some circumstances. *See* PX 19 ("Field tests have proven that it's difficult to find and repair rips in black and clear barriers. . . . [I]t's easier for construction workers to spot trouble spots in yellow plastic. If they can see the puncture, then they can repair it, which helps maintain the integrity of the overall system.").

## II. <u>APPLICATION OF LAW</u>

### A. <u>The Functionality Doctrine</u>

"The Lanham Act gives a seller or producer the exclusive right to 'register' a trademark, and to prevent his or her competitors from using that trademark." *Qualitex Company v. Jacobson Products Company, Inc.*, 514 U.S. 159, 162 (1995) (internal citations omitted). "The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods."[5] *TrafFix Devices,*

---

[5] "Secondary meaning" obtains when "in the minds of the public, the
(continued...)

*Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 28 (2001).  The Act, however, "expressly limits the scope of trade dress protection by providing that 'the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.'"[6]  *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir.) (*quoting* 15 U.S.C. § 1125(a)(3)), *cert. denied*, 537 U.S. 1071 (2002).  The "functionality doctrine" prevents a producer from using trademark law to inhibit legitimate competition by controlling a useful product feature.  *Qualitex*, 514 U.S. at 164.  "If a product's functional features could be used as trademarks . . ., a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks [unlike patents] may be renewed in perpetuity)."  *Id.* at 164-65.

Courts have distinguished "*de facto* functional features, which may be entitled to trademark protection, from *de jure* functional features, which are not."  *Valu*

---

[5](...continued)

primary significance of a product feature . . . is to identify the source of the product rather than the product itself."  *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n.11 (1982); see also *Board of Supervisors for Louisiana State University Agricultural and Mechanical College v. Smack Apparel Company*, 550 F.3d 465, 476 (5th Cir. 2008), *cert. denied*, __ U.S. __, 129 S.Ct. 2759 (2009).

[6]     Registration on the PTO's principal register provides "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce or in connection with the goods or services specified in the registration. . . ."  15 U.S.C. § 1115(a); see also *ERBE Elektromedizin GmbH v. Canady Technology LLC*, 629 F.3d 1278, 1288 (Fed. Cir. 2010).

*Engineering, Inc. v. Rexnord Corporation*, 278 F.3d 1268, 1274 (Fed. Cir. 2002). "In essence, *de facto* functional means that the design of a product has a function, *i.e.*, a bottle of any design holds fluid. *De facto* functionality does not necessarily defeat registrability." *Id. De jure* functionality, on the other hand, means that a product has a certain feature because "it works better" with that feature. See *id.*

The Supreme Court recognizes two tests for determining whether a product feature is *de jure* functional. *TrafFix*, 532 U.S. at 32. "In general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id.* (internal quotation marks omitted). This is the "traditional" definition of functionality, and "under this traditional definition, if a product feature is 'the reason the device works,' then the feature is functional." *Eppendorf*, 289 F.3d at 355.

The second test for functionality is the "competitive necessity" test. *Id.* at 356. Under this test, "a functional feature is one the 'exclusive use of which would put competitors at a significant non-reputation-related disadvantage.'" *Id.* (quoting *Qualitex*, 514 U.S. at 165). This test is an expansion of the traditional test, and is not of itself a comprehensive definition of functionality. *Id.* Indeed, "[t]he primary test for functionality is the traditional test, and there is no need to consider the 'competitive necessity' test where a product feature is functional under the traditional definition." *Id.* (citing *TrafFix*, 532 U.S. at 33-35).

1. *The Burden of Proof*

Both parties agree that Stego's registration of the mark on the principal register creates a presumption that the mark is valid. Stego Industries, LLC's Post Trial Brief ("Stego Brief") at 1; Poly-America L.P.'s Post-Trial Brief ("Poly-America Brief") at 4. They disagree, however, on the consequence of that presumption. Stego claims that it shifts the burden of persuasion to Poly-America. Stego Brief at 1 n.1. Poly-America retorts that the presumption requires it to produce evidence of functionality, but Stego must ultimately prove that the mark is not functional. Poly-America Brief at 4. The court agrees with Poly-America.

The court -- beginning, as it must, with the text of the Lanham Act -- finds that the statute provides little guidance on this point. Section 43 of the Act states, "In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. § 1125(a)(3). But, the plain language of this provision limits its applicability to trade dress "*not registered on the principal register*."[7] *Id.* (emphasis added). On the other hand, section 32 -- which does apply to trademarks registered on the principal

---

[7] It would be illogical to deduce from section 43 that the burden of proving functionality of a registered mark rests with the party challenging the mark. The contrapositive of an "if A, then B" proposition is not "if not A, then not B." The court therefore refuses to accept this faulty reasoning as a basis for imposing the burden of proof on Poly-America.

register -- provides that registration of a mark is "admissible in evidence and shall be prima facie evidence of the validity of the registered mark. . ., but shall not preclude another person from proving any legal or equitable defense or defect, including . . . (b)(8) That the mark is functional." 15 U.S.C. § 1115(a), (b)(8).

The text of section 32 might be read to place the burden of "proving" functionality on the party asserting that defense. Such an interpretation, however, would enervate the provision's antecedent reference to "prima facie evidence," a phrase that typically describes a requisite production of evidence, not the burden of proof. *E.g.*, *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (explaining that the plaintiff's burden to establish a prima facie case is an "intermediate" burden, which serves to bring the court to the ultimate question, but does not shift the "ultimate burden of persuading the trier of fact"); *see also* BLACK'S LAW DICTIONARY 638-39 (9th ed. 2009) ("Evidence that will establish a fact or sustain a judgment unless contradictory evidence is produced."). To avoid this result, the court will construe section 32 to create a rebuttable presumption that requires the party claiming functionality to produce sufficient evidence to rebut the presumption, but does not relieve the party asserting trademark protection of its burden of persuasion on the matter. See *Goscicki v. Custom Brass & Cooper Specialities, Inc.*, 229 F. Supp. 2d 743, 748-49 (E.D. Mich. 2002) (explaining the textual differences between sections 43 and 32, and resolving that section 32 creates a rebuttable

presumption); see also *Test Masters Educational Services, Inc. v. Singh*, 428 F.3d 559, 567 (5th Cir. 2005) ("Registration is *prima facie* proof that the registered mark is distinctive. However, this presumption can be overcome by showing that the mark is merely descriptive. The burden then shifts to the registrant to prove that its mark has secondary meaning."), *cert. denied*, 547 U.S. 1055 (2006).[8] This burden-shifting approach comports with the Fifth Circuit's trademark jurisprudence, which consistently demands that the party asserting trademark protection prove that the disputed mark is legally protectable. See *Amazing Spaces, Inc. v. Metro Mini Storage*,

---

[8] Placing the burden of proof squarely on the party alleging functionality would also contravene the purpose of the Lanham Act. The Act seeks to promote competition and secure the owner of a mark the goodwill of its business. *Eppendorf*, 289 F.3d at 355. Competition might be scotched by the mere threat of an infringement action if the burden of proving functionality rests with new entrants into a market because potential competitors might forgo such entry altogether for fear of not being able to satisfy this burden. Cf. *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 214 (2000) ("It is true, of course, that the person seeking to exclude new entrants would have to establish the nonfunctionality of the design feature. . . . Competition is deterred, however, not merely by successful suit but by the plausible threat of successful suit . . . ."). If, however, a product's feature is not functional and serves only a reputation-related advantage, the party laying claim to that feature should reasonably be expected to evince its non-functionality by demonstrating, for example, that it is simply an ornamental, incidental, or arbitrary aspect of the device. See *Traffix*, 532 U.S. at 30 ("[O]ne who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device."). "The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." *Id.* at 34. Requiring the party asserting protection to prove that the matter is not functional "gives force to the well-established rule that trade dress protection may not be claimed for product features that are functional." *Id.* at 29.

608 F.3d 225, 239 (5th Cir. 2010) (applying the burden-shifting approach); *Test Masters*, 428 F.3d at 567 (same); see also *Eppendorf*, 289 F.3d at 358 ("We conclude that Eppendorf failed to carry its burden of proving non-functionality.").

For example, the plaintiff in *Amazing Spaces* sued the defendant for infringement of a mark registered on the principal register. *Amazing Spaces*, 608 F.3d at 231. The defendant argued that the mark was invalid because it was not "inherently distinctive," *id.* at 237, and produced competent summary judgment evidence to demonstrate the ubiquitous use of the mark in Texas. See *id.* at 238. The Fifth Circuit concluded that the defendant's "introduction of evidence that the [mark] is not distinctive has reduced the presumption of validity to evidence that the PTO is of the opinion that the [mark] is sufficiently distinctive to be legally protectable as a mark." *Id.* at 239. In so doing, the court noted that this burden-shifting approach is consistent with prior Fifth Circuit decisions and generally compatible with the jurisprudence of its sister circuits. *Id.* (citing cases). The burden-shifting framework must apply here.

Poly-America's evidence proves that Stego advertises high visual contrast and low heat absorption as utilitarian benefits of its yellow vapor barrier. PX 8, 19. This evidence sufficiently nullifies the presumption of validity bestowed on the mark by registration. *Talking Rain Beverage Company, Inc. v. South Beach Beverage Company*, 349 F.3d 601, 603-04 (9th Cir. 2003) (concluding that advertising utilitarian features is

evidence of functionality); *Valu,* 278 F.3d at 1274 (outlining *Morton-Norwich [In re Morton-Norwich Products, Inc.,* 671 F.2d 132 (CCPA 1982)] factors of functionality, including "advertising materials in which the originator of the design touts the design's utilitarian advantages"); *ASICS Corporation v. Target Corporation*, 282 F. Supp. 2d 1020, 1029 (D. Minn. 2003) ("Advertising or other marketing by the proponent of trademark rights that touts the utilitarian features of its design can provide significant evidence of functionality."). Stego, therefore, bears the burden of proving that its mark is not functional. For the reasons that follow, Stego failed to carry its burden.

### 2. *Functionality of Stego's Mark*

#### a. <u>The Traditional Test</u>

To demonstrate that its mark is not functional under the traditional test, Stego must prove by a preponderance of the evidence that yellow is not "essential to the use or purpose" and does not affect the "cost or quality" of its vapor barrier. *TrafFix,* 532 U.S. at 32. The parties agree that adding color to vapor barrier negatively affects both its cost and quality by increasing manufacturing costs and diluting the concentration of the product's ingredients. Tr. 47:19-25, 109:2-19, 365:11-366:8. They dispute whether the cost of yellow pigment on average is cheaper than the cost of other comparable colors, including orange. This question need not be resolved, however, because the court finds that yellow is essential to the use of vapor barrier.

On balance, the evidence proves that yellow -- as a bright, light color -- provides utilitarian benefits, both in hot climates and where the underlying soil is of a darker hue, by absorbing less heat and contrasting well with the underlying soil and overlaying rebar. *See* Tr. 54:1-12, 74:25-75:2, 82:15-83:4; PX 19. Indeed, Stego's own representatives testified that color can be added to vapor barrier to increase or decrease its heat absorption, Tr. 355:7-23, and/ or enhance its visual contrast with the underlying soil. Tr. 430:18-431:15. And logic dictates that yellow, as a color, offers these utilitarian benefits in some circumstances. Stego attempts to minimize this fact by arguing that no one color works best in all circumstances because some soils are light and some contractors place sand layers underneath the vapor barrier, Tr. 121:14-122:13, 350:9-17, and the absorption of heat might be beneficial in some cases because it can help warm a job site and increase the likelihood that the tape used on the seams will adhere to the vapor barrier in cold climates. Tr. 355:7-23. The court is not persuaded. Even if true, these facts would not negate yellow's *de jure* functionality.

A product feature need not be functional in all applications to fall outside the scope of a legally protectable trademark; rather, "[f]unctionality may be established by a single competitively significant application. . . ." *Valu*, 278 F.3d at 1277-78. To hold otherwise would tie resolution of the functionality question to a review of the "entire universe of potential uses of a contested mark . . ., seriously undermin[ing] the

goals of the functionality doctrine" by making it more difficult to find *de jure* functionality in a product feature that unequivocally offers utilitarian benefits in some -- but not all -- applications. See *id.* This would countermand the Supreme Court's caution against "misuse or overextension of trade dress," *TrafFix*, 532 U.S. at 29, because the functionality doctrine plays a vital role in limiting the reach of trade dress protection. *Eppendorf*, 289 F.3d at 355 ("The requirement of non-functionality 'prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature.'"). The weaker the functionality doctrine is in practice, the more likely that trademark protection will be extended to product features that otherwise would be open to copying. See *Sportvision, Inc. v. Sportsmedia Technology Corporation*, No. C 04-3115 JW, 2005 WL 1869350, at *4 (N.D. Cal. Aug. 4, 2005) ("Functionality is a judicially-created doctrine that limits the aspects of a product configuration which may be trademarked.").

In the case *sub judice*, the utilitarian benefits that accompany the use of yellow vapor barrier in some circumstances justify a finding of *de jure* functionality under the traditional test.

The Fifth Circuit's decision in *Eppendorf* supports this conclusion. There, the plaintiff, Eppendorf, sued the defendant, Ritter, asserting various trademark and trade dress infringement claims in connection with the sale of disposable pippette tips

and dispenser syringes, used in the medical industry, capable of accurate and rapid multiple-dispensing of liquids. *Eppendorf*, 289 F.3d at 353-54. Relevant here, Eppendorf claimed that the "coloring scheme" used on the defendant's products infringed its trade dress. *Id.* Finding that "[t]he color scheme used on the [product] -- clear plastic with black lettering -- enables the user easily to see and measure the amount of liquid in the [product], and black is standard in the medical industry," the Fifth Circuit concluded that the coloring scheme is "essential to the operation" of the pippette tips and therefore *de jure* functional. *Id.* at 358. In reaching its decision, the Fifth Circuit did not consider the "entire universe" of possible applications for pippette tips. One can certainly imagine a scenario (*e.g.*, the presence of a dark-colored liquid) in which black lettering would offer less contrast and make it more difficult to measure the amount of liquid in the pippette tip than lettering of a different color. Nevertheless, the Fifth Circuit determined the coloring scheme at issue in *Eppendorf* to be functional because it provided utilitarian benefits in some circumstances by enabling a user to easily see and measure the liquid to be dispensed. See *id.*

The Federal Circuit's decision in *ERBE*, 629 F.3d 1278, is also instructive. There, the parties disputed, among other things, whether trade dress protection could be extended to the color blue as applied to the tube portion of argon plasma coagulation ("APC") probes. *Id.* at 1281. ERBE, the plaintiff, argued that the district

court erred in granting summary judgment on the issue to the defendant because "there is a genuine issue of material fact whether the color blue is functional because the evidence demonstrates that blue is not uniquely superior for APC probes, has no competitive advantage because it is not essential to the use or purpose of the APC probes, does not have an aesthetic function, and that many other colors are equally visible against human tissue and are available for selection." *Id.* at 1289. Discounting what it described as "a conclusory, self-serving statement by Mr. Erbe" that "other colors are as visible through an endoscopic camera as the color blue," the Federal Circuit affirmed the lower court's ruling based on the record evidence, which demonstrated that "the color blue is prevalent in the medical field, the blue color enhances identification of the endoscopic tip, and several companies use blue endoscopic probes." *Id.* Like the Fifth Circuit in *Eppendorf*, the Federal Circuit adjudged the color functional based on its high visual contrast in one application, without considering that characteristic in every application.

Here, the evidence presented at trial unequivocally shows that the color yellow, as applied to vapor barrier, offers utilitarian benefits for construction sites with torrid temperatures and/ or dark-colored soils. On hot job sites, yellow vapor barrier provides a safer and cooler environment for workers because it attracts less heat than darker-colored products. Tr. 74:25-75:2, 82:15-83:4, 189:13-19. The product itself will also remain cooler, decreasing the risk of unwanted movement and concrete

curing problems.  Pretrial Order at 15-16 ¶ 19.  Additionally, yellow contrasts well with dark-colored soil and rebar, enabling workers to easily detect and repair tears, punctures, and pinholes that threaten the integrity of the vapor barrier.  Tr. 54:1-12; *see also* PX 19.  This benefit cannot be overstated.  Both parties agree that a vapor barrier's damaged areas must be repaired.  Pretrial Order at 19 ¶ 35.  They also agree that laborers must be able to see damaged areas to repair them, and high visual contrast with the underlying soil allows workers to easily identify damaged areas.  *Id.*; PX 19.  And, there is no dispute that any damaged area left unrepaired would permit moisture to migrate from the earth to the concrete slab (and potentially into the building), preventing the vapor barrier from performing its intended function.  Pretrial Order at 18 ¶ 34.  If workers can see trouble areas, they can repair them.  Yellow can make this process easier.  The color yellow, therefore, is essential to the use and purpose of vapor barrier in some circumstances.  *Eppendorf*, 289 F.3d at 358.

Stego, for its part, argues that the benefits of yellow are "ancillary" so yellow is not "*essential*" to the use or purpose of vapor barrier.  Stego Brief at 7-8, 22 (emphasis original).  According to Stego, because "the addition of color, yellow or otherwise, is not necessary to prevent the migration of vapor gas or vapor moisture," yellow is not functional.  See *id.* at 17.  Stego likens its use of yellow on vapor barrier to the plaintiff's use of color on press pads in *Qualitex*.  *Id*. at 18.  This argument, however, is unavailing.

In *Qualitex*, the Supreme Court held that there is no absolute bar on the use of color alone as a trademark. 514 U.S. at 162. The plaintiff in that case owned a trademark on a "special shade of green-gold color on the pads that it makes and sells to dry cleaning firms for use on dry cleaning presses," and sued the defendant for infringement. *Id.* at 161. Upholding the mark against an invalidity challenge, the Court specifically found that "[t]he green-gold color acts as a symbol . . ., it identifies the press pads' source. And, the green-gold color *serves no other function*." *Id.* at 166 (emphasis added). In so doing, the Court gave meaning to the phrase "essential to the use or purpose of the article," which it had previously proclaimed as the traditional test for functionality in *Inwood*, 456 U.S. at 850 n.10.

A feature is "essential to the use or purpose" of a product if it serves any significant function other than to distinguish a firm's goods or identify their source. See *Qualitex*, 514 U.S. at 165-66 (citing *In re Owens-Corning Fiberglas Corporation*, 774 F.2d 1116, 1123 (Fed. Cir. 1985), for the proposition that a product feature is not essential if it "performs no nontrademark function."). The Court made this point particularly clear in *TrafFix*, 532 U.S. at 33, by finding the disputed mark in that case functional because "beyond serving the purpose of informing consumers that the sign stands are made by MDI (assuming it does so), the dual-spring design provides a unique and useful mechanism to resist the force of the wind." *Id.* "Essential," as used in the traditional test of functionality, therefore, does not equate a layman's

understanding of the word; it is a term of art, used to distinguish product features that only serve to identify a product's source from those that serve "any other significant function." See *Qualitex*, 514 U.S. at 166.

Admittedly, in *Qualitex*, the Court did note in a parenthetical that "it is important to use *some* color on press pads to avoid noticeable stains" but there is "no competitive need in the press-pad industry for the green-gold color, since other colors are equally useable." *Id.* at 166 (emphasis original) (internal quotation marks omitted). As clarified in *TrafFix*, however, the Court determine this to be a question of "[a]esthetic functionality," resolution of which depended on an inquiry into "significant non-reputation-related disadvantages." 532 U.S. at 33. The Fifth Circuit does not recognize "aesthetic functionality," *Smack Apparel*, 550 F.3d at 487-88 ("We do not believe that the Court's dictum in *TrafFix* requires us to abandon our long-settled view rejecting recognition of aesthetic functionality"), so aesthetic functions are not "significant" non-trademark functions for the purpose of the functionality inquiry. More importantly, the evidence in this case shows that the "nontrademark function" served by yellow is utilitarian, not aesthetic. While yellow is not "the reason [vapor barrier] works" in the formal sense, -- that is, vapor barrier does not prevent the migration of vapor gas or moisture because it is yellow -- it certainly "serves a significant nontrademark function," *Qualitex*, 514 U.S. at 169, by enhancing visual contrast and attracting less heat in some circumstances. See *Baughman Tile*

*Company, Inc. v. Plastic Tubing, Inc.*, 211 F. Supp. 2d 720, 725 (E.D. N.C. 2002) (finding yellow tubing functional because of "its reflective qualities, [and it] remains stiffer in the heat and less susceptible to damage."). For this reason, the color yellow, as applied to vapor barrier used in the construction industry, is *de jure* functional and not legally protectable under federal trademark law.

### b. The "Competitive Necessity" Test

While a court need not consider a product feature's "competitive necessity" if it is functional under the traditional definition, *Eppendorf*, 289 F.3d at 356, given that Stego made the availability of alternatives a focal point of its case, the court deems it appropriate, out of an abundance of caution, to assess yellow's functionality under this secondary test. For this purpose, the court will assume for the sake of argument that yellow is not essential to the use or purpose of vapor barrier.

Stego was first to the market with vapor barrier meeting ASTM standards. Tr. 318:7-10. It was also the first, and to this court's knowledge the only, company to trademark the color used on its vapor barrier. Tr. 175:21-25. Since then, according to Stego, all of its competitors, save Poly-America, have respected its mark, Tr. 387:20-25, by manufacturing, marketing, or selling vapor barrier either without color or in a color other than yellow.[9] Tr. 369:20-372:8.

_____

[9]     Stego did not timely comply with Poly-America's discovery requests to produce all documents regarding other entities that manufacture, sell, or distribute vapor barrier in the color yellow. Stego produced information about CETCO, a

(continued...)

Under the competitive necessity test, "a functional feature is one the 'exclusive use of which would put competitors at a significant non-reputation-related disadvantage.'" *Eppendorf*, 289 F.3d at 356 (quoting *Qualitex*, 514 U.S. at 165). As previously discussed, yellow vapor barrier contrasts well with underlying soil and overlaying rebar and it does not attract much heat, making the vapor barrier itself, and the construction site as a whole, cooler. Even if these utilitarian benefits are ancillary and do not rise to the level of *de jure* functionality under the traditional test, they are significant enough to invalidate Stego's trademark under the competitive necessity test. Granting Stego exclusive use of these non-trademark functions would entrench Stego's competitive advantage by preventing potential competitors from effectively competing for the business of those customers who prefer yellow vapor

---

[9](...continued)
company that manufactures and sells a yellow "waterproofing membrane" used in the construction industry, Tr. 388:5-9, on the eve of trial. Poly-America moved for sanctions and sought an adverse inference as a consequence of this discovery abuse. Poly-America L.P.'s Emergency Motion for Adverse Inference or Discovery and Trial Continuance for Stego's Just Discovered Discovery Misconduct (docket entry 105). The court carried the motion to trial. Order (docket entry 113).

CETCO began selling its yellow Coreflex product in March of 2007. Tr. 392:24-393:2. In October of 2010, Stego sent CETCO a cease and desist letter after learning about Coreflex. Tr. 290:13-291:7; 400:17-401:12. The parties entered into negotiations about a possible licensing agreement, but never executed an agreement. Tr. 281:10-302:1, 402:15-403:22; PX 36. Having reviewed the evidence on CETCO's "waterproofing membrane," particularly Stego's admission that the product can be used underneath a concrete slab, Tr. 282:8-14, 284:24-285:4, the court finds it appropriate to infer that CETCO chose to use yellow on its products because, among other things, yellow offers utilitarian benefits in terms of high visual contrast and low heat absorption.

barrier because it offers the described benefits. *See* Tr. 333:7-15. Stego's trademark on yellow enables it to "interfere with legitimate (nontrademark-related) competition through actual . . . exclusive use of an important product ingredient." *Qualitex*, 514 U.S. at 170.

This court has previously invalidated a mark where the color in use was one of a few available alternatives that would offer comparable benefits in terms of visibility and conspicuity. In *RaceTrac Petroleum, Inc. v. J.J.'s Fast Stop, Inc.*, No. 3:01-CV-1397-P, 2003 WL 251318, at *2 (N.D. Tex. Feb. 3, 2003) (Solis, J.), the plaintiff, RaceTrac, alleged that the defendant infringed its trademark and trade dress. *Id.* Among other things, RaceTrac's trade dress included (1) a display of the term "TRAC" in white letters and outlined by black on a red background; (2) large price signs near the street or highway bearing the name "TRAC" on a red background above oversize black numbers set on a yellow background; and (3) red striping on buildings, islands, pumps, and signage. *Id.* Noting that the predominant colors in the gasoline retail marketplace are "black, white, red, blue, yellow, and green," the court found all three coloring schemes functional because they provide "contrast . . . [which] enables drivers to see the price information at greater distances, with smaller numbers, in peripheral vision, and under poorer weather conditions," and "attracts the eye of the customer. . . ." *Id.* at *13-14.

Here, the vapor barrier market does not appear to be dominated by any particular colors, but the industry has generally moved away from black and colorless vapor barrier. *See* Tr. 369:20-372:8, 385:17-20; DX 57. In hot climates where dark-colored soils are present, however, an optimal mix of heat reflection and visual contrast can be achieved only by using vapor barrier that is a bright, light color. Although some of Stego's competitors manufacture, market, and/ or sell dark-colored vapor barrier, Stego openly advertises that these products do not offer the same visual-contrast and heat-absorption benefits as its light-colored vapor barrier. PX 19; *see also* Tr. 147:5-7. Thus, the field of colors offering benefits comparable to Stego's yellow is to limited in that respect. It is limited further by the fact that Stego's trademark covers all gradients of yellow, Tr. 172:15-21, and custom-colored vapor barrier costs more to manufacture than vapor barrier in standard colors. Tr. 127:11-128:8; PX 35. So to effectively compete with Stego, in terms of selling vapor barrier with benefits comparable to Stego's yellow, a competitor must offer a non-yellow bright, light product that is of a standard color, or pay more to sell a custom-colored vapor barrier. This reeks of the "color depletion" concerns that the Supreme Court has made clear the doctrine of functionality would prevent: if all of the standard colors are trademarked, competitors will be forced to pay more to compete effectively. *Qualitex*, 514 U.S. at 168-69 ("[I]f a "color depletion" or "color scarcity" problem

does arise–the trademark doctrine of "functionality" normally would seem available to prevent the anticompetitive consequences that [this] argument posits. . . .").

It is important to note that just because some of Stego's competitors use dark colors on their vapor barrier, it does not follow that light colors serve no utilitarian non-trademark function. As an example, many of Stego's competitors manufacture, market, and/or sell vapor barrier in many colors, *see* Tr. 371:1-372:1, despite the increased costs and decreased quality associated with the addition of color. Tr. 47:14-25. This begs the question: why would a company pay more to manufacture, market, or sell multiple colors of a weaker product? That some companies do undermines Stego's argument that color serves only to indicate the origin of the goods. *Cf.* Tr. 373:21-25 (testifying that consumers approach vapor barrier distributors "asking for the yellow stuff."). To the contrary, the evidence suggests that companies are willing to pay more for multiple colors of a weaker product in order to satisfy consumer demand. Tr. 47:23-25, 324:3-325:7, 369:20-372:8. Even Stego abandoned its yellow vapor barrier on a number of occasions to satisfy this demand. Tr. 311:24-313:8. Given the utilitarian benefits of using light colors in some circumstances, it is reasonable to infer that Stego's trademark on the color yellow put its competitors at a significant nonreputation-related disadvantage in this regard. See *Sportvision*, 2005 WL 1869350, at *7 ("[S]ince the color yellow provides at least one of a few superior colors for its de facto purpose, it follows that

competition is hindered.").  Stego has not proven otherwise.  Thus, even if the court

assumed *arguendo* that yellow is not functional under the traditional test, Stego's mark

would still be invalid under the competitive necessity test.

## B.  Stego's Common Law Rights

State law cannot protect functional aspects of a product; to the extent it does,

it is preempted by federal patent law.  See *Bonito Boats, Inc. v. Thunder Craft Boats,*

*Inc.*, 489 U.S. 141, 151-52 (1989) (explaining that federal patent laws must

determine not only what is protected, but what is free for all to use); *Astoria Industries*

*of Iowa, Inc. v. Brand FX Body Company*, No. 2-08-144-CV, 2010 WL 1433404, at *8

(Tex. App.--Ft. Worth Apr. 8, 2010, pet. denied) (mem. op.) (noting that state unfair

competition laws are not preempted unless they conflict with federal patent law by

protecting "functional aspects" of a product).  Because the court has determined that

yellow, as applied to vapor barrier, is functional and cannot be protected under

federal law, Stego's state common law rights must yield to this result.  Consequently,

Stego has no common law trademark right to the exclusive use of yellow.

## C.  Fraudulent Procurement

To prevail on a claim of fraudulent procurement, the party asserting the claim

must prove by clear and convincing evidence:  "1) the false representation regarding a

material fact; 2) the registrant's knowledge or belief that the representation is false

(scienter); 3) the intention to induce action or refraining from action in reliance on

the misrepresentation; 4) reasonable reliance on the misrepresentation; and 5) damages proximately resulting from such reliance." *Texas International Property Associates v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582, 592 (N.D. Tex. 2009) (Kinkeade, J.); *San Juan Products, Inc. v. San Juan Pools of Kansas, Inc.*, 849 F.2d 468, 473 (10th Cir. 1988). "[I]n the trademark context, a material misrepresentation arises only if the registration should not have issued if the truth were known to the examiner." *San Juan Products*, 849 F.2d at 473 (*quoting* 2 J. McCarthy, Trademarks and Unfair Competition § 31:21, at 606).

Poly-America failed to carry its burden of proving fraudulent procurement. Paul Blasdell and Carrol Bryan testified that Stego chose yellow to distinguish its product and not because of the color's utilitarian benefits. Tr. 143:13-16, 232:18-21. Poly-America's evidence did not successfully refute this claim. That Mr. Blasdell and Mr. Bryan may have known through experience in the field that yellow contrasts well with soil and rebar, or absorbs less heat than darker colors, does not demonstrate that they intended to deceive the PTO examiner by representing that the selection of the color yellow was arbitrary. More importantly, Poly-America did not introduce any evidence to suggest that the PTO examiner reasonably relied on Stego's representations regarding the functionality of yellow. To the contrary, the evidence shows that Stego included an advertisement touting the utilitarian benefits of yellow in its response to the PTO examiner's initial rejection of the mark. Tr. 229:14-23.

Although that advertisement was one of more than one-hundred pages in its response, there is no evidence in the record to suggest that the PTO examiner did not view or consider it before registering the mark. Poly-America certainly has not proven the point by clear and convincing evidence. As a result, the court finds for Stego on Poly-America's fraudulent procurement claim.

### III. <u>CONCLUSION</u>

For the reasons discussed above, the court concludes that Stego has not carried its burden of proving that the color yellow, as applied to polyethylene sheeting used as vapor barrier in the construction industry, is not functional. Consequently, Stego's mark is not valid.

Counsel for Poly-America, as the party which largely prevailed in this case, shall submit -- within fourteen days of this date -- a proposed form of judgment conforming to this memorandum opinion and order.

**SO ORDERED**.

July 27, 2011.

*A. Joe Fish*
_____
**A. JOE FISH**
**Senior United States District Judge**